**COURT OF APPEALS
DECISION
DATED AND FILED**

**February 26, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP2026**

STATE OF WISCONSIN

Cir. Ct. No. 2021CV137

IN COURT OF APPEALS
DISTRICT II

KONKANOK RABIEBNA, RICHARD A. FREIHOEFER,
DOROTHY M. BORCHARDT, RICHARD HEIDEL AND
NORMAN C. SANNES,

   PLAINTIFFS-APPELLANTS,

 V.

HIGHER EDUCATIONAL AIDS BOARD AND CONNIE HUTCHINSON,

   DEFENDANTS-RESPONDENTS.

APPEAL from an order of the circuit court for Jefferson County: WILLIAM F. HUE, Judge. *Reversed and cause remanded with directions*.

Before Gundrum, P.J., Grogan and Lazar, JJ.

¶1    GUNDRUM, P.J. Taxpayer appellants Konkanok Rabiebna, Richard A. Freihoefer, Dorothy M. Borchardt, Richard Heidel and Norman C.

Sannes challenge WIS. STAT. § 39.44 (2023-24)[1] and the grant program administered thereunder by the Higher Educational Aids Board (HEAB) and Connie Hutchinson.[2] Appellants contend the statute and program violate the Equal Protection Clause of the United States Constitution and article I, section 1 of the Wisconsin Constitution because they provide taxpayer-funded college grants for which financially needy students of only certain racial, national origin, ancestry and alienage groups are eligible.[3] Appellants appeal from an order of the circuit court denying them summary judgment and granting summary judgment to HEAB and Hutchinson.

¶2 In 2023, the United States Supreme Court released its landmark decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* (*SFFA*), 600 U.S. 181 (2023), in which the Court stated, in the context of that higher education admissions case, that "the 'core purpose' of the Equal Protection Clause" is "do[ing] away with all governmentally imposed discrimination based on race" and emphasized that "[e]liminating racial

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

[2] HEAB is a state government agency; Hutchinson is the executive secretary for HEAB and responsible for administering the grant program on its behalf.

[3] While appellants bring their claims under both the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and article I, section 1 of the Wisconsin Constitution, they make no independent arguments under the Wisconsin Constitution. "Article I, [s]ection 1 [of the Wisconsin Constitution] has been interpreted as providing the same equal protection … rights afforded by the Fourteenth Amendment to the United States Constitution." *Mayo v. Wisconsin Injured Patients & Fams. Comp. Fund*, 2018 WI 78, ¶35, 383 Wis. 2d 1, 914 N.W.2d 678. Accordingly, we do not separately address appellants' claims under the Wisconsin Constitution.

As noted, appellants include "alienage" in their claims of equal protection discrimination. We assume this is solely due to the Laotian, Vietnamese and Cambodian citizenship status referred to in WIS. STAT. § 39.44(1)4.

discrimination means eliminating all of it," *id.* at 206 (first alteration in original). The Court agreed the clause "requires equality of treatment before the law for all persons without regard to race or color," *id.* at 205, and "no State has any authority under the [clause] to use race as a factor in affording educational opportunities among its citizens," *id.* at 204 (citation omitted). The Court reiterated that "'[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.' That principle cannot be overridden except in the most extraordinary case." *Id.* at 208 (citation omitted).

¶3    WISCONSIN STAT. § 39.44 and the grant program are directly at odds with all of these equal protection principles. For the following reasons, we agree with appellants that § 39.44 and the program are unconstitutional.

## BACKGROUND

¶4    In 1985, the legislature and governor enacted WIS. STAT. § 39.44 (1985-86) to provide taxpayer-funded grants for financially needy "Black American," "American Indian" and "Hispanic" undergraduate students enrolled in Wisconsin private, nonprofit higher educational institutions (hereinafter "private colleges").[4]  In 1987, the legislature and governor expanded the grant program to also (1) make eligible for grants any financially needy undergraduate "who is admitted to the United States after December 31, 1975, and who either is a former citizen of Laos, Vietnam or Cambodia or whose ancestor was or is a citizen of Laos, Vietnam or Cambodia," and (2) provide grants for eligible students

---

[4]  Consistent with the language used in WIS. STAT. § 39.44 and HEAB's briefing, we also will use the terms "Black American," "American Indian" and "Hispanic."

attending Wisconsin technical colleges, in addition to eligible students attending private colleges. *See* § 39.44 (1987-88). Section 39.44 provides in relevant part:

> **(1)**(a) In this section "minority undergraduate" means an undergraduate student who:
>
> 1. Is a Black American.
>
> 2. Is an American Indian.
>
> 3. Is a Hispanic, as defined in [WIS. STAT. §] 16.287(1)(d).[5]
>
> 4. Is a person who is admitted to the United States after December 31, 1975, and who either is a former citizen of Laos, Vietnam or Cambodia or whose ancestor was or is a citizen of Laos, Vietnam or Cambodia.
>
> (b) There is established, to be administered by the board, the … grant program for minority undergraduates enrolled in private [colleges] in this state or in technical colleges in this state.
>
> **(2)** Funds for the grants … shall be distributed from the appropriation … with 50 percent distributed to the eligible private institutions and 50 percent distributed to the eligible technical colleges. The board shall audit the enrollment statistics annually.
>
> **(3)** An institution or school receiving funds under sub. (2) shall:
>
> (a) Award grants to eligible students on the basis of financial need.
>
> (b) Demonstrate to the satisfaction of the board that such funds do not replace institutional grants to the recipients.
>
> (c) Annually report to the board the number of awards made, the amount of each award, the minority status of each recipient, other financial aid awards made to each

---

[5] WISCONSIN STAT. § 16.287(1)(d) defines "Hispanic" as "a person of any race whose ancestors originated in Mexico, Puerto Rico, Cuba, Central America or South America or whose culture or origin is Spanish."

recipient and the total amount of financial aid made available to the eligible students.

Students of a race, national origin, ancestry or alienage other than Black American, Hispanic, American Indian, Laotian, Cambodian, or Vietnamese are ineligible for any grant under the grant program regardless of whether they would otherwise qualify. For the 2021-22 academic year, $819,000 was allocated for the program.

¶5 Additionally, administrative rules provide that to be eligible for a grant, a financially needy student of one of the eligible racial, national origin, ancestry or alienage groups must also be either a citizen or permanent resident of the United States, a Wisconsin resident, and "enrolled as a sophomore, junior or senior on at least a half-time basis in a technical … or a private [college] in Wisconsin eligible to participate in the grant program." WIS. ADMIN. CODE § HEA 12.02 (Nov. 2024). The rules also provide that a "student's grant award shall not exceed $2,500 per academic year" and students are eligible for a grant for up to eight semesters. WIS. ADMIN. CODE § HEA 12.03 (Nov. 2024).

¶6 Appellants filed this action seeking a declaratory judgment that the grant program violates the Equal Protection Clause of the United States Constitution and article I, section 1 of the Wisconsin Constitution because students belonging to the preferred racial, national origin, ancestry, or alienage groups are eligible for the grants, while students of other racial, national origin, ancestry, or alienage groups are not eligible.[6] The parties filed cross-motions for summary

---

[6] Appellants also alleged an equal protection violation under 42 U.S.C. § 1983 but appear to have abandoned this claim, as they do not address it. *See **A.O. Smith Corp. v. Allstate Ins. Cos.***, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998) ("[A]n issue raised in the [circuit] court, but not raised on appeal, is deemed abandoned.").

judgment, addressing standing as well as the constitutionality of the grant program. The circuit court determined the appellants have standing to challenge the program but upheld it as constitutional, granting summary judgment to HEAB and denying the same to appellants. Appellants appeal.

¶7 After the parties submitted their appellate briefs, the United States Supreme Court decided *SFFA*. The parties thereafter submitted letters to this court addressing the impact of that decision. We subsequently held oral argument and took the unusual step of allowing for post-argument briefing.

## **DISCUSSION**

¶8 On June 29, 2023, the Supreme Court released its decision in *SFFA*, constituting a significant change in how race-based higher education admissions programs are evaluated under the Equal Protection Clause. HEAB maintains the grant program is constitutional, even under *SFFA*.[7] HEAB is incorrect.

I. Standard of Review

¶9 Our review of the circuit court's summary judgment decision is de novo. *See **Behrendt v. Gulf Underwriters Ins. Co.***, 2009 WI 71, ¶11, 318 Wis. 2d 622, 768 N.W.2d 568. Summary judgment is appropriate when there are

---

[7] The parties' initial briefing focused heavily on *Grutter v. Bollinger*, 539 U.S. 306 (2003), which prior to the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* (*SFFA*), 600 U.S. 181 (2023), was the most significant Supreme Court precedent relevant to this appeal. Thorough consideration of *Grutter* and the record in this case convinces us the grant program would be in violation of the Equal Protection Clause even if *Grutter* still controlled. Because it does not, however, we need not lengthen this decision further by engaging in the academic exercise of providing that legal analysis.

no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

II. Standing

¶10    As an initial matter, HEAB argued in the circuit court, as it does similarly on appeal, that the appellants lack standing to challenge the grant program because they bring their suit as "mere" taxpayers.  Considering the taxpayer-standing decision of *Fabick v. Evers*, 2021 WI 28, 396 Wis. 2d 231, 956 N.W.2d 856, the circuit court concluded that "the Wisconsin Supreme Court has recognized and conferred standing to the taxpayers in this case, through its holding in *Fabick*."  We agree.

¶11    Whether a party has standing presents a question of law we review de novo.  *See Teigen v. WEC*, 2022 WI 64, ¶10, 403 Wis. 2d 607, 976 N.W.2d 519, *overruled on other grounds by Priorities USA v. WEC*, 2024 WI 32, 412 Wis. 2d 594, 8 N.W.3d 429; *Silver Lake Sanitary Dist. v. DNR*, 2000 WI App 19, ¶6, 232 Wis. 2d 217, 607 N.W.2d 50.

¶12    In *Fabick*, our supreme court considered executive orders Governor Tony Evers issued in 2020 declaring a state of emergency in response to the Covid-19 virus and granting the governor and the Department of Health Services extraordinary powers to combat the growing threat.  396 Wis. 2d 231, ¶¶1-3.  Two and one-half months after the first order expired, Evers issued another executive order declaring a state of emergency, and when that order was close to expiring, he issued another.  *Id.* ¶¶5-7.  Fabick brought a declaratory judgment action challenging Evers' legal authority to issue the second and third orders.  *Id.*, ¶¶3, 7.

¶13    Evers contended Fabick lacked standing to maintain the action, *id.*, ¶¶8-9, but the *Fabick* court concluded he had standing as a taxpayer because Wisconsin taxpayer funds had already been and could again be expended to deploy the National Guard pursuant to the executive orders.  *Id.*, ¶11 & n.5. Specifically, the court noted that at the time Fabick filed his suit, Wisconsin taxpayers were responsible for funding twenty-five percent of the costs of the Guard deployments, with the federal government picking up the other seventy-five percent.  *Id.*  "This expenditure of taxpayer funds," the court stated, "gives Fabick a legally protected interest to challenge the Governor's emergency declarations." *Id.*, ¶11.

¶14    The *Fabick* court further determined that Fabick had standing even though it appeared that by early 2021, the federal government was funding one hundred percent of the Wisconsin National Guard costs related to Covid-19 and retroactively paying for past costs.  Standing still existed, the court held, because "[t]axpayer funds ha[d] already been spent in support of the National Guard deployments" and there was an "imminent threat of unreimbursed costs, past and future" given that the federal government could again alter its position on such costs.  *Id.*, ¶11 n.5.  In the case now before us, there is far more than an "imminent threat" of the expenditure of taxpayer dollars—millions of "unreimbursed" taxpayer funds have been spent on the WIS. STAT. § 39.44 grant program since 1985 and millions more would be spent if it continued.[8]

---

[8] Although prompted by the extraordinary circumstance of a pandemic, *Fabick* was not an anomaly.  In *State ex rel. Wisconsin Senate v. Thompson*, 144 Wis. 2d 429, 432-36, 424 N.W.2d 385 (1988), our supreme court determined taxpayer petitioners had standing in a declaratory judgment action challenging the breadth of the governor's partial veto authority over the 1987-89 biennial budget bill.  The court concluded that Thomas Loftus and Frederick Risser, respectively the Assembly Speaker and Senate President at the time, who brought the action "in

(continued)

¶15    HEAB also claims appellants lack standing because "[their] requested relief would result in no difference in expenditures.    They seek to remove race-based classifications from the [g]rant [p]rogram, but do not seek to *end* the grant, meaning the money would be spent either way."[9]   We are unmoved. We are not at liberty to simply open up the grant program to all students who would otherwise qualify absent the racial, national origin, ancestral and alienage restrictions.   Were we to do so, we—not the legislature and governor—would be effectively enacting an altogether different government program.   With the grant program, the legislature did not simply enact another financial aid program for all financially needy students; rather, it specifically and intentionally targeted students who were members of certain racial, national origin, ancestry and alienage groups. If the legislature (with or without the governor) wishes to enact a grant program that is open to everyone who meets certain qualifications, but without racial, national origin, ancestry and alienage restrictions, it may choose to do so.   But it did not do so with WIS. STAT. § 39.44, and it is not our role to do so ourselves. Our role is to determine whether the program is constitutional as it stands. Because it is not, taxpayer dollars may no longer be spent on this program.

_____

their individual capacities as taxpayers as well as in their official capacities," "*as residents and taxpayers* … met the requirements for standing to bring this declaratory judgment action."   *Id.* at 436 (emphasis added).   The court added, "we need not consider the absence of any specific allegation in the petition that Risser or Loftus, either individually or as a class, have suffered pecuniary loss, to be fatal."   *Id.*   Moreover, the decision did not identify any challenges by Risser and Loftus related to *increased* expenditures of taxpayer funds in the budget; rather, their noted challenges related to *reductions* in expenditures the legislature had passed.   *Id.* at 456-61.   The governor had vetoed parts of the budget bill so various state programs or entities would have *less* taxpayer money to spend; thereby, the governor's challenged actions presumably *saved* taxpayers money.   *Id.*

    [9] At oral argument, appellants indicated their support for a full elimination of the grant program.

¶16    HEAB directs us to Justice Hagedorn's concurrence in **Teigen**, 403 Wis. 2d 607, authored just one year after Hagedorn wrote **Fabick**, but this effort goes nowhere.    Teigen brought a declaratory judgment action challenging documentary guidance the Wisconsin Elections Commission provided to municipal clerks regarding ballot drop boxes.  **Id.**, ¶¶1-2.  While Hagedorn acknowledged the holding of **Fabick** that "taxpayers have a legal right 'to contest governmental actions leading to an illegal expenditure of taxpayer funds,'" **Teigen**, 403 Wis. 2d 607, ¶163 (Hagedorn, J., concurring), he found unpersuasive Teigen's argument that Teigen had standing because tax dollars had been used to distribute the memos and to pay the salaries of the commission staff members who prepared them, **id.**  Hagedorn concluded that taxpayer standing does not extend this broadly as it "would mean any taxpayer could challenge almost any government action—as long as a government employee devoted some time and attention to the matter.  Since that is nearly always true, this would practically eliminate standing as a consideration in most challenges to government action." **Id.**  Citing numerous prior cases in which the court determined there was taxpayer standing, Hagedorn noted that "[o]ur taxpayer standing cases have always involved an alleged illegal expenditure distinct from staff time." **Id.** n.2.

¶17    Here, it is undisputed that hundreds of thousands of taxpayer dollars are being spent on the grant program every year; appellants' claim is not founded on "staff time" or the distribution of memos.  **Teigen** in no way undermines the taxpayer standing appellants have in this case.

III.  Equal Protection Principles

¶18    The more meaty question before us is whether WIS. STAT. § 39.44 and the grant program violate the Equal Protection Clause, which is a question of

law we review de novo.  *See Madison Teachers, Inc. v. Walker*, 2014 WI 99, ¶13, 358 Wis. 2d 1, 851 N.W.2d 337.  We presume all legislative acts constitutional, and "we must indulge every presumption to sustain the law." *Id.*

¶19    The Equal Protection Clause of the Fourteenth Amendment "guarantees every person the right to be treated equally by the State, without regard to race."[10]  *Fisher v. University of Tex. at Austin*, 570 U.S. 297, 315-16 (2013) (Thomas, J., concurring); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 226-27 (1995).  "[A]t the heart of the Constitution's guarantee of equal protection lies the simple command that the [g]overnment must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class."  *SFFA*, 600 U.S. at 223 (citing *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).  "Because the Fourteenth Amendment 'protects *persons*, not *groups*,' all 'governmental action based on race—a *group* classification long recognized as in most circumstances irrelevant and therefore prohibited—should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed.'"  *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003). WISCONSIN STAT. § 39.44 and the grant program run afoul of the Equal Protection Clause.

---

[10] Under the Equal Protection Clause, strict scrutiny applies not only to discrimination related to race but also to discrimination based on national origin, ancestry and alienage.  *See, e.g., SFFA*, 600 U.S. at 308-09 (Gorsuch, J., concurring) (race and national origin); *Fisher v. University of Tex. at Austin*, 570 U.S. 297, 309-10 (2013) (race and ancestry); *Gregory v. Ashcroft*, 501 U.S. 452, 468 (1991) (alienage); *A.M.B. v. Circuit Ct. for Ashland Cnty.*, 2024 WI 18, ¶19, 411 Wis. 2d 389, 5 N.W.3d 238 (race, national origin and alienage), *cert. denied*, 93 U.S.L.W. 3169 (U.S. Jan. 13, 2025) (No. 24-441).

IV. Application

¶20    To properly apply these principles, we begin with a discussion of the Supreme Court's **SFFA** decision.[11]

### A. The **SFFA** decision

¶21    In 2003, the Supreme Court held in **Grutter v. Bollinger** that "the Equal Protection Clause does not prohibit [the University of Michigan] Law School's narrowly tailored use of race in admissions decisions to further a *compelling interest* in obtaining the *educational benefits* that flow from a *diverse student body*." 539 U.S. at 343 (emphases added). The Court stated that it was "endors[ing] Justice Powell's view [in **Regents of University of California v. Bakke**, 438 U.S. 265, 311-15 (1978)] that student body diversity is a compelling state interest that can justify the use of race in university admissions" and held that "the Law School has a compelling interest in attaining a diverse student body." **Grutter**, 539 U.S. at 325, 328. Its holding in large part was based on its "deference" to the university's "educational judgment that *such diversity* is essential to *its educational mission*." **Id.** at 328 (emphases added).

---

[11] In its post-**SFFA** letter brief to this court, HEAB discounts the import of **SFFA**, arguing that the case is limited to admissions policies and is not applicable to financial aid programs, like the grant program addressed here. HEAB, however, fails to direct us to any cases that *do* address financial aid programs and conceded at oral argument that it was not aware of any such cases. Of note, in its response brief, submitted to this court prior to the release of **SFFA**, HEAB relied heavily upon **Grutter**—an admissions policy case—in support of its arguments that the grant/financial aid program here is constitutional. Indeed, HEAB wrote: "Although **Grutter** involved an admissions policy that sought to admit minority students, its discussion of diversity in higher education covers any program designed to attain that same end, such as financial aid." In the absence of an on-point race-based grant/financial aid decision from the Supreme Court, admissions policy cases such as **Grutter** and **SFFA** appear to be the next best thing. The equal protection principles articulated in **SFFA** are easily applicable to the financial aid context.

¶22 Twenty years after *Grutter*, the Supreme Court changed course with *SFFA*. In *SFFA*, the Court considered whether the admissions programs of Harvard College and the University of North Carolina violated the Equal Protection Clause of the Fourteenth Amendment because "admissions decisions … turn[ed] on an applicant's race." 600 U.S. at 197-98, 208. In the Harvard admissions process, the Court noted, an applicant's race was taken "into account" throughout the entire process, with the goal being "'to make sure that [Harvard does] not hav[e] a dramatic drop-off' in minority admissions from the prior class." *Id.* at 194 (alterations in original; citation omitted). As a result of this process, "'race [wa]s a determinative tip for' a significant percentage 'of all admitted African American and Hispanic applicants.'" *Id.* at 195 (citation omitted). The Court observed that "[a]n African American [student] in [the fourth lowest academic] decile has a higher chance of admission (12.8%) than an Asian American in the *top* decile (12.7%)" and "black applicants in the top four academic deciles are between four and ten times more likely to be admitted … than Asian applicants in those deciles." *Id.* at 197 n.1 (first alteration added; citations omitted).

¶23 With UNC's admissions program, initial "readers" of admission applications were "required to consider '[r]ace and ethnicity … as one factor' in their review." *Id.* at 195 (alterations in original; citation omitted). In making their recommended decisions, readers were allowed to "offer students a 'plus' based on their race, which 'may be significant in an individual case.'" *Id.* at 196 (citation omitted). "The admissions decisions made by the first readers [we]re, in most cases, 'provisionally final.'" *Id.* (citation omitted). A review committee then made the final admission decision on each recommendation by the initial reader,

and in making those decisions, was allowed to "consider the applicant's race." *Id.* at 196-97. The *SFFA* Court observed that as a result of this process,

> over 80% of all black applicants in the top academic decile were admitted to UNC, while under 70% of white and Asian applicants in that decile were admitted. In the second highest academic decile … 83% of black applicants were admitted, while 58% of white applicants and 47% of Asian applicants were admitted. And in the third highest decile, 77% of black applicants were admitted, compared to 48% of white applicants and 34% of Asian applicants.

*Id.* at 197 n.1 (citations omitted).

¶24 After setting out the structure and impact of the Harvard and UNC admissions programs, the *SFFA* Court reviewed relevant history of the Equal Protection Clause. The Court observed that "[t]he conclusion reached by the *Brown* [*v. Board of Education*] Court was … unmistakably clear: the right to a public education 'must be made available to all on equal terms.'" *SFFA*, 600 U.S. at 204 (citing *Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954)). The *SFFA* Court noted that its lead decision in *Bakke*, decided forty-five years earlier, explained that race may not be used "to foreclose an individual 'from *all consideration* … simply because he [or she] was not the right color,'" *SFFA*, 600 U.S. at 209 (emphasis added; quoting *Bakke*, 438 U.S. at 318). The *SFFA* Court embraced the argument of the plaintiffs in *Brown* that "no State has *any authority* under the equal-protection clause of the Fourteenth Amendment to use race as *a* factor in affording educational *opportunities* among its citizens." *SFFA*, 600 U.S. at 204 (emphases added; citation omitted). The Court stated that the second *Brown* case, *Brown v. Board of Education* (*Brown II*), 349 U.S. 294, 298 (1955), had clearly indicated that "[t]he time for making distinctions based on race had passed" and noted that *Brown II* observed that *Brown* had "declar[ed] the fundamental principle that racial discrimination in public education is

14

unconstitutional." ***SFFA***, 600 U.S. at 204 (first alteration added; citing ***Brown II***, 349 U.S. at 298). The ***SFFA*** Court further noted how "[i]mmediately after ***Brown***, [the Court] began routinely affirming lower court decisions that invalidated all manner of race-based state action"—specifically referencing cases involving segregation in busing and at public beaches and bathhouses—not simply state action related to education. ***SFFA***, 600 U.S. at 204-05. The ***SFFA*** Court agreed with a lower court that had "explained [that] '[t]he equal protection clause requires equality of treatment before the law for all persons without regard to race or color." ***Id.*** at 205 (first alteration added; citation omitted).

¶25 The ***SFFA*** Court stated that the "core purpose" of the Equal Protection Clause is "do[ing] away with all governmentally imposed discrimination based on race" and emphasized that "[e]liminating racial discrimination means eliminating all of it." 600 U.S. at 206 (second alteration added); *see also* ***Washington v. Davis***, 426 U.S. 229, 239 (1976) ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."). The Court explained that the clause "applies 'without regard to any differences of race, of color, or of nationality'—it is 'universal in [its] application,'" ***SFFA***, 600 U.S. at at 206 (alteration in original; citation omitted), and further stated that "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color. If both are not accorded the same protection, then it is not equal." ***Id.*** (alteration in original; quoting ***Bakke***, 438 U.S. at 289-90 (Powell, J.)).

¶26 The Court explained that outside of the context of universities making race-based admissions decisions for student body diversity, "our precedents have identified only two compelling interests that permit resort to race-

based government action. One is remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and "[t]he second is avoiding imminent and serious risks to human safety in prisons, such as a race riot." *SFFA*, 600 U.S. at 207. The Court stated that its "acceptance of race-based state action has been rare for a reason. 'Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.' That principle cannot be overridden except in the most extraordinary case." *Id.* at 208 (citations omitted).

¶27 After highlighting these equal protection principles, the *SFFA* Court considered the constitutionality of the Harvard and UNC admissions programs. In doing so, the court explained that in the context of "race-based admissions," it had permitted such admissions "only within the confines of narrow restrictions. University programs [1] must comply with strict scrutiny, [2] they may never use race as a stereotype or negative, *and*—[3] at some point—they must end." *Id.* at 213 (emphasis added). The Harvard and UNC programs, the Court concluded, failed with regard to each restriction.

¶28 As to the first restriction—compliance with strict scrutiny—the government must show that "the racial classification is used to 'further compelling governmental interests," and if it does, that "the government's use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *Id.* at 206-07 (citation omitted). "Because '[r]acial discrimination [is] invidious in all contexts,'" the Court further noted, prior decisions have "required that universities operate their race-based admissions programs in a manner that is 'sufficiently measurable to permit judicial [review]' under the rubric of strict scrutiny." *Id.* at 214 (alterations in original; citations omitted). "'Classifying and assigning' students based on their race," the Court stated, "requires more than … an

16

amorphous end to justify it." *Id.* (citing *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 735 (2007)).

¶29    While the *SFFA* Court expressed that Harvard's and UNC's stated goals focusing on the "educational benefits" of student body diversity were "commendable," it declared that those goals—i.e., the purported compelling interests, such as "better educating its students through diversity" (Harvard) and "promoting the robust exchange of ideas" (UNC), among others—"are not sufficiently coherent for purposes of strict scrutiny." 600 U.S. at 214-15 (citations omitted).   The Court expressed its concern that the goals were "standardless," "inescapably imponderable" and essentially unmeasurable and there was no way "to know when [the goals] have been reached, and when the perilous remedy of racial preferences may cease." *Id.*  With this holding, the *SFFA* Court effectively overruled the *Grutter* Court's holding that educational benefits associated with student body diversity constitute a compelling state interest.

¶30    The *SFFA* Court further determined that Harvard's and UNC's race-based admissions programs also did not satisfy the second strict scrutiny requirement that they be narrowly tailored, concluding that the programs "fail[ed] to articulate a meaningful connection between the means they employ and the goals they pursue." 600 U.S. at 215.

¶31    The Court was clearly troubled by Harvard's and UNC's decisions to "measure the racial composition of their classes" using the following "opaque" categories: "(1) Asian; (2) Native Hawaiian or Pacific Islander; (3) Hispanic; (4) White; (5) African-American; and (6) Native American," stating, "[i]t is far from evident … how assigning students to these racial categories and making admissions decisions based on them furthers the educational benefits that the

universities claim to pursue." *Id.* at 216-17. The Court noted that some of the categories "are plainly overbroad," pointing out that "by grouping together all Asian students, for instance, respondents are apparently uninterested in whether *South* Asian or *East* Asian students are adequately represented, so long as there is enough of one to compensate for a lack of the other." *Id.* The Court was further troubled that "other categories are underinclusive," noting that at oral argument UNC's counsel could not answer "how … applicants from Middle Eastern countries [are] classified, [such as] Jordan, Iraq, Iran, [and] Egypt." *Id.* (first alteration added). The Court also found disturbing that Harvard and UNC "would apparently prefer a class with 15% of students from Mexico over a class with 10% of students from several Latin American countries, simply because the former contains more Hispanic students than the latter." *Id.* at 217. The Court expressed that "[i]t is hard to understand how a plan that could allow these results can be viewed as being concerned with achieving enrollment that is 'broadly diverse.'" *Id.* (alteration in original; citation omitted). The Court reiterated that "[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification," *id.* at 217-18 (alteration in original; quoting *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003)), and concluded that the admissions programs at both Harvard and UNC failed to demonstrate such a connection, *SFFA*, 600 U.S. at 217-18.

¶32 As to the second restriction for "race-based admissions," the *SFFA* Court explained that the Harvard and UNC programs "fail[ed] to comply with the twin commands of the Equal Protection Clause that race may never be used as a 'negative' and that it may not operate as a stereotype." *Id.* at 218. The Court emphasized that "an individual's race may never be used against him [or her] in the admissions process," noting that with the programs before it, race was used as

18

a negative because "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* at 218-19. Noting that "race—and race alone—explains the admissions decisions for hundreds if not thousands of applicants to UNC each year," the Court observed that both universities acknowledged that "race is determinative for at least some— if not many—of the students they admit." *Id.* at 219 & n.6. "How else but 'negative' can race be described," the Court concluded, "if, in its absence, members of some racial groups would be admitted in greater numbers than they otherwise would have been?" *Id.* at 219.

¶33 The Court also was concerned with the stereotyping involved with making admissions decisions based upon race, stating that "Harvard's admissions process rests on the pernicious stereotype that 'a black student can usually bring something that a white person cannot offer.' [And,] UNC is much the same. It argues that race in itself 'says [something] about who you are.'" *Id.* at 220 (first alteration added; citations omitted). The Court stated:

> We have time and again forcefully rejected the notion that government actors may intentionally allocate preference to those "who may have little in common with one another but the color of their skin." The entire point of the Equal Protection Clause is that treating someone differently because of their skin color is *not* like treating them differently because they are from a city or from a suburb, or because they play the violin poorly or well.

*Id.* (citation omitted). When a university admits students based upon race, the Court indicated, it "furthers 'stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens— according to a criterion barred to the Government by history and the Constitution.'" *Id.* at 220-21 (quoting *Miller*, 515 U.S. at 912). Such

stereotyping, the Court stated, is contrary "to the 'core purpose' of the Equal Protection Clause." *Id.* at 221 (citation omitted).

¶34 The Court also deemed Harvard's and UNC's programs to be constitutionally infirm because they had no "logical end point," the third restriction for race-based admissions programs. *Id.* (quoting *Grutter*, 539 U.S. at 342). The Court observed that in *Grutter* it had emphasized that race-based admissions programs "[must] have a termination point." *SFFA*, 600 U.S. at 212 (alteration in original; quoting *Grutter*, 539 U.S. at 342). The *SFFA* Court stated that an end point "was the reason the [*Grutter*] Court was willing to dispense temporarily with the Constitution's unambiguous guarantee of equal protection." 600 U.S. at 212. The *SFFA* Court noted that the *Grutter* Court further expressed that "'[e]nshrining a permanent justification for racial preferences' … 'would offend this fundamental equal protection principle,'" *SFFA*, 600 U.S. at 212 (alteration in original; quoting *Grutter*, 539 U.S. at 343), and pointed out that "*Grutter* … insist[ed], over and over again, that race-based admissions programs be limited in time," *SFFA*, 600 U.S. at 229 n.9.

¶35 Responding to Harvard's and UNC's contentions that their programs did not need to have an end point because the universities regularly review their programs to determine their continued necessity, the *SFFA* Court stated that "*Grutter* never suggested that periodic review could make unconstitutional conduct constitutional. To the contrary, the Court made clear that race-based admissions programs eventually had to end—despite whatever periodic review universities conducted." *SFFA*, 600 U.S. at 225. Noting that Harvard had not "set a sunset date" for its race-based admissions program, UNC's program "is likewise not set to expire any time soon—nor, indeed, any time at all," and UNC "has not set forth a proposed time period in which it believes it can end all race-

conscious admissions practices," the *SFFA* Court expressed that there was "no reason to believe that respondents will—even acting in good faith—comply with the Equal Protection Clause any time soon." *Id.* at 225 (citations omitted).

¶36 The *SFFA* Court provided the clear parameters under which an individual's race could constitutionally play a role in the admissions process, explaining that a university could "consider[] an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise." *Id.* at 230. The Court emphasized, however, that

> [a] benefit to a student who overcame racial discrimination, for example, must be tied to *that student's* courage and determination. Or a benefit to a student whose heritage or culture motivated him or her to assume a leadership role or attain a particular goal must be tied to *that student's* unique ability to contribute to the university. In other words, the student must be treated based on his or her experiences as an individual—not on the basis of race.

*Id.* at 230-31.

¶37 With the equal protection principles of *SFFA* laid bare, we now turn to WIS. STAT. § 39.44 and the grant program administered pursuant to that statute.

### B. Strict Scrutiny Requirement

¶38 Under the Fourteenth Amendment, "any official action that treats a person differently on account of his race or ethnic origin is inherently suspect," *Fisher*, 570 U.S. at 310 (citation omitted), and "must survive [the] daunting two-step examination known … as 'strict scrutiny,'" *SFFA*, 600 U.S. at 206. Strict scrutiny "is an exacting standard, and it is the rare case in which a law survives it." *State v. Roundtree*, 2021 WI 1, ¶27, 395 Wis. 2d 94, 952 N.W.2d 765. Strict scrutiny requires the government "to demonstrate with clarity that its 'purpose or

interest is both constitutionally permissible and substantial [i.e., a compelling government interest], and that its use of the classification is necessary … to the accomplishment of its purpose [i.e., narrowly tailored].'" *Fisher*, 570 U.S. at 309 (citing *Bakke*, 438 U.S. at 305). WISCONSIN STAT. § 39.44 and the grant program fail both strict scrutiny requirements.

### 1. No Compelling State Interest

¶39 To satisfy the strict scrutiny requirement for a race-based government benefit, the government must prove "that the reasons for any [racial] classification [are] clearly identified and unquestionably legitimate." *Fisher*, 570 U.S. at 310 (alterations in original; citation omitted). HEAB does not even come close to making this showing.

¶40 Leaning heavily upon *Grutter*, in its pre-*SFFA* response brief, HEAB unmistakably asserted that the legislature had enacted WIS. STAT. § 39.44 establishing the grant program in order to address a "crisis in higher education" by financially assisting students of the preferred racial, national origin, ancestry and alienage groups to stay in private and technical colleges so as to foster "student body diversity" on those campuses and not "rob[] *the schools* of the enriching environment a diverse student body brings." (Emphasis added.) HEAB insisted the legislature created the grant program "to solve the problem of *schools* losing their diverse student bodies through financial attrition, which is the same compelling end at issue in *Grutter*: attaining student body diversity." (Emphasis added.) Thus, pre-*SFFA*, HEAB represented that the legislature enacted § 39.44 for the purpose of increasing student body diversity and doing so for the benefit of the schools.

¶41   Obviously understanding *SFFA*'s holding—that the "educational benefits" of student body diversity are "not sufficiently coherent" to constitute a compelling government interest, *SFFA*, 600 U.S. at 214—in its post-*SFFA* letter to this court, HEAB eschews the idea that student body diversity was the legislature's reason for establishing the grant program.   As if the release of a Supreme Court decision in 2023 can change the reasons the legislature enacted this statute and program in 1985, HEAB now asserts the legislature enacted the program to boost retention and graduation rates of students from the preferred racial, national origin, ancestry and alienage groups—no longer for the sake of a diverse campus environment but due to a "crisis" in such rates of Black American, Hispanic, and American Indian students.   At oral argument, HEAB leaned into its modified, post-*SFFA* position by expounding that the "crisis" the legislature was responding to in enacting WIS. STAT. § 39.44 was really the "disparity" between the retention and graduation rates for Black American, Hispanic and American Indian students and such rates for Asian and white students.

¶42   As indicated, *SFFA* completely cut the legs out from under HEAB's originally asserted government interest of student body diversity.   But HEAB also does not meet its burden to show that its revised post-*SFFA* asserted government interest of increasing retention/graduation rates of students in the preferred groups, and relatedly reducing the disparity in retention/graduation rates between students from those groups and students from nonpreferred groups, is a compelling interest. HEAB has not made the case that even if there was sufficient proof in the record—and there is not—of an early 1980s disparity "crisis" in these groups' retention and graduation rates *at Wisconsin private and technical college*s and that the legislature enacted WIS. STAT. § 39.44 for the purpose of mitigating *that disparity*, that such disparity mitigation constitutes a compelling state interest.

23

¶43   When asked at oral argument whether it had "any case law support that says improving retention and graduation rates for certain minority groups but not others is a compelling state interest," HEAB humbly and forthrightly responded that it is "hoping … this court issues the first opinion."  That is a big ask, particularly when HEAB has developed no argument, drawing from equal protection decisions in any context, as to why improving retention/graduation rates for the preferred groups or mitigating a retention/graduation disparity between certain racial, national origin, ancestry or alienage groups is a compelling government interest.  Moreover, HEAB's *ipse dixit*[12] of a retention/graduation "crisis" does not come close to satisfying its "daunting" burden under strict scrutiny of demonstrating that this is one of "the most extraordinary case[s]" that could justify providing these taxpayer-funded grants to only students of the preferred racial, national origin, ancestry or alienage groups.  *See SFFA*, 600 U.S. at 208.

¶44   The *SFFA* Court effectively noted that now that student body diversity on campus is no longer a compelling government interest justifying racial preference in admissions, the Court's "precedents have identified only two compelling interests that permit resort to race-based government action"— "remediating specific, identified instances of past discrimination that violated the Constitution or a statute" and "avoiding imminent and serious risks to human safety in prisons, such as a race riot."  *Id.* at 207.  Neither of these apply here.  Again, HEAB develops no argument suggesting that improving

---

[12] "Ipse dixit" is a Latin phrase meaning "[s]omething asserted but not proved."  *Ipse dixit*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see also Ipse dixit*, GARNER'S DICTIONARY OF LEGAL USAGE (3rd ed. 2011) ("[S]omething said but not proved.").

retention/graduation rates or disparities of students of certain races, national origins, ancestries and alienage comes anywhere close to those two "most extraordinary" types of circumstances justifying race-, national origin-, ancestry- or alienage-specific policies, and we conclude they do not. Powerfully, the *SFFA* Court, in that higher-education context, embraced the position that "no State has *any authority* under the equal-protection clause of the Fourteenth Amendment to use race as *a* factor in affording educational *opportunities* among its citizens." *Id.* at 204 (emphases added; citation omitted). HEAB has failed to show that improving retention/graduation rates of students in the preferred racial, national origin, ancestry and alienage groups at Wisconsin private and technical colleges or mitigating the disparity in those rates between students in the preferred groups and students in nonpreferred groups constitutes a compelling government interest.[13]

> a. The record does not support the legislature's enactment of the grant program.

¶45 As indicated, HEAB has failed to meet its burden to demonstrate a compelling government interest justifying the racial, national origin, ancestry and alienage classifications of WIS. STAT. § 39.44. But even if HEAB's assertion of an early to mid-1980s educational "crisis" due to disparity in retention/graduation rates between Black American, Hispanic and American Indian students on the one

---

[13] We further point out that even *Grutter* held that "universities cannot establish [a] quota[] for members of certain racial groups or put members of those groups on separate admissions tracks." 539 U.S. at 334. A "quota" is "a program in which a certain fixed number or proportion of opportunities are 'reserved exclusively for certain minority groups.'" *Id.* at 335 (citation omitted). As appellants pointed out at oral argument, "100 out of 100" grants awarded under WIS. STAT. § 39.44 must be to students in the preferred racial, national origin, ancestry and alienage groups, while zero students who are not in those preferred groups can receive grants. One hundred percent of grants are "reserved exclusively for certain minority groups." *See id.* (citation omitted).

hand and students of other races, national origins, ancestries or alienage on the other constituted a compelling government interest—and it does not—HEAB's position falls flat for the simple reason that HEAB has been unable to direct us to any record evidence—and we have been unable to find any—indicating there even was such a "crisis" or disparity at Wisconsin private or technical colleges.[14] This is in part because the evidence in the record relates to graduation rates at *University of Wisconsin (UW) system four-year universities*, not Wisconsin private or technical colleges. And even that evidence shows graduation rates were *increasing* around the time leading into enactment of § 39.44 for all racial groups except Black American students—hardly a "crisis" for the preferred groups with increasing rates.

¶46     Quoting from and relying on a 1985 Legislative Fiscal Bureau (LFB) memo, HEAB asserts that "[t]he stated intention of the [Grant] [P]rogram is to encourage minority undergraduate students to remain in *the University* by providing financial support." (First alteration added; emphasis added.) Significantly, the memo is related to the creation of two different minority grant programs for the UW system four-year universities, not the WIS. STAT. § 39.44 grant program. Dated just three months before § 39.44 was enacted, the 1985 LFB memo, in discussing the budget proposal to create similar grants for UW system four-year universities, states that "[s]ome have argued that the grants could be

---

[14] When asked at oral argument what evidence is in the record of a disparity in retention and graduation rates for students of the preferred groups at Wisconsin private and technical colleges prior to the enactment of WIS. STAT. § 39.44 and the grant program, HEAB could identify no such evidence and asked for time to "scour the record" and submit a brief addressing this issue. We granted this request. Given the additional time, HEAB still could not identify any evidence that students of the preferred groups had lower retention/graduation rates than other groups at Wisconsin private and technical colleges in the early to mid-1980s.

used for minority students in *private schools*…. It should be noted, however, that there is no formal proposal from independent institutions or HEAB *and no evaluation of need has been made*. The Governor's proposal is addressed specifically to the request of the University of Wisconsin." (Emphases added.) Again, § 39.44 provides grants for students enrolled in Wisconsin private and technical colleges, not UW-Madison or other UW system four-year universities. This LFB memo did not identify, for the legislature or anyone else, a retention/graduation or disparity problem for students in the preferred racial, national origin, ancestry or alienage groups for either private colleges or technical colleges.

¶47　　HEAB also submitted and relies upon a May 1984 report from "the Joint University of Wisconsin System/Department of Public Instruction Committee on Minority Student Affairs." To begin, HEAB provides us no reason to believe this report was even seen, much less relied upon, by any legislator at any time, so there is no reason to believe it is in any way relevant to determining the intent of the legislature in enacting WIS. STAT. § 39.44. Furthermore, this report does not support the enactment of § 39.44 because it too relates only to UW four-year universities, not Wisconsin private or technical colleges. The report states that the joint committee considered the "[t]estimony and comments … received from approximately one hundred people representing the various racial and ethnic groups of the state, including high school and university students, parents, counselors, community organizers, public school teachers, university faculty and staff, and other concerned citizens." We see no indication any input was received from persons connected with private or technical colleges. The report indicated that the UW system and regents "should adopt for each year of the decade beginning September, 1985, specific goals related to increasing the

percentages of minority students who completed a *baccalaureate* degree" and suggested the development of a grant program for "junior and senior year minority students enrolled *at the University of Wisconsin System institutions*." (Emphases added.)

¶48 Additionally, a 1987 LFB memo submitted by HEAB echoes the 1985 LFB memo. The 1987 memo refers to a Legislative Audit Bureau review of "UW System" minority enrollment data, which review showed that while enrollment in the UW system for Black Americans declined ten percent from 1980 to 1985, enrollment *increased* over twenty-two percent for Hispanics and over thirteen percent for American Indians during the same time period. Again, WIS. STAT. § 39.44 and the grant program were enacted in 1985. Relatedly, the 1987 LFB memo indicates that "[t]he decline in enrollment has translated into a 14.2% decrease in degrees conferred [i.e., graduation] to [Black Americans] compared to a *20.6% increase* in degrees conferred to other minority students" during that same critical time period leading into the enactment of this grant program. (Emphasis added.) HEAB conceded at oral argument that these were "accurate numbers." The memo further indicates that compared with publicly funded institutions nationwide, the UW system was "above the national enrollment increase for all groups except black students." With its foundational representation of a "crisis" in retention/graduation rates eviscerated, HEAB is left with its neutered assertion that there was "still a disparity in retention and graduation rates as compared to other groups," adding at oral argument that "its great that they're improving against their own benchmark, but they're still not improving compared to others." Again, HEAB provides no legal support that such a disparity would constitute a compelling state interest even if any of the data from its reports and memos actually related to Wisconsin's private and technical

colleges in the early to mid-1980s. Thus, even if the above documents submitted by HEAB did relate to Wisconsin private and/or technical colleges, they still would not provide HEAB the "crisis" support it wishes they did.

¶49    As noted, nothing in the record suggests the legislature had any data before it indicating Wisconsin private or technical colleges—either individual colleges or as a collective group—had a problem retaining or graduating students from the preferred minority groups around the time WIS. STAT. § 39.44 was enacted. Indeed, as appellants point out in post-oral argument briefing, for all this court knows, based on the record, "private universities in the 1980s were implementing their own affirmative action programs." And, for all we know, such programs were remarkably successful. In short, the record provides no evidence indicating there was a problem, much less a "crisis," in Wisconsin's private or technical colleges that needed the legislature to enact a race-, national origin-, ancestry-, or alienage-based remedy. It is complete speculation.

¶50    Moreover, HEAB provides us with no basis to assume from its UW system four-year-universities-related memos and report any conclusions related to retention/graduation rates or disparities at private or technical colleges. Even if the record did show a retention and graduation crisis for students of all of the preferred groups at UW system four-year universities during the relevant time frame—which it does not—we cannot simply assume the legislature must have enacted the WIS. STAT. § 39.44 grant program to address an unidentified retention and graduation problem at private and technical colleges. Considering the significant differences in the nature of technical colleges and UW system four-year universities in particular, we see no basis to make such an assumption. As appellants further and correctly suggest, for all this court knows from the record, "the purported decline in black enrollment at some public universities was caused

by an increase in black enrollment at technical colleges—who knows, based on this record."

¶51 As technical colleges are generally *two*-year institutions,[15] a technical college education would naturally cost less than an education at a UW system *four*-year university. Furthermore, as the website for the Wisconsin Technical College System touts, the annual tuition at a technical college in Wisconsin is significantly less than that at a UW system four-year university. *See* WISCONSIN TECHNICAL COLLEGE SYSTEM, http://www.wtcsystem.edu/technical-college-benefits/affordable (last visited Feb. 12, 2025). For example, using present-day data, the 2024-25 annual tuition for a school in the Wisconsin Technical College System is $4,485 while the 2024-25 annual tuition at the least costly UW System four-year university (UW-Parkside) is $6,978 and at the most costly (UW-Madison) is $10,006.[16] Thus, at least in considering a student's financial burden, the $2,500 annual maximum grant available through the grant program is more than offset by the fact technical college annual tuition is approximately $3,000-$6,000 lower than tuition at a UW system four-year university. As a result, there is strong reason to believe that a technical college student who does not receive financial assistance from the WIS. STAT. § 39.44 grant program would be in a better position as far as cost goes than a student at any one of the UW system four-year universities who does receive assistance from

---

[15] "The Wisconsin Technical College System offers more than 500 programs awarding two-year associate degrees, one- and two-year technical diplomas, short-term technical diplomas and certificates." WISCONSIN TECHNICAL COLLEGE SYSTEM, http://www.wtcsystem.edu (last visited Feb. 12, 2025).

[16] *See* WISCONSIN TECHNICAL COLLEGE SYSTEM, https://www.wtcsystem.edu/technical-college-benefits/affordable/ (last visited Feb. 12, 2025); UNIVERSITIES OF WISCONSIN, https://uwhelp.wisconsin.edu/pay-for-college/annual-tuition/ (last visited Feb. 12, 2025).

the similar UW system grant. At oral argument, HEAB conceded that in regard to time to graduate and cost, technical colleges are indeed a "different animal" than UW system four-year universities. We see no basis to conclude that any mid-1980s "disparities" in retention and graduation rates at UW system four-year universities, which disparities are relied upon by HEAB and proclaimed by it to be due to financial struggles, suggest similar disparities or retention/graduation issues at Wisconsin two-year technical colleges.

¶52     Even if members of the legislature who voted for the creation of this grant program had considered the information in the various memos and report relied upon by HEAB, the memos and report do not support a conclusion that there was in fact a retention/graduation or disparity problem, much less a "crisis," at Wisconsin private or technical colleges in the early to mid-1980s for students of the preferred minority groups.

### b. The 1987 expansion of the grant program fares no better.

¶53     Two years after the 1985 enactment of the grant program, the legislature expanded it to include any undergraduate student "who is admitted to the United States after December 31, 1975, and who either is a former citizen of Laos, Vietnam or Cambodia or whose ancestor was or is a citizen of Laos, Vietnam or Cambodia." WIS. STAT. § 39.44(1)(a)4. (1987-88). HEAB has directed us to no record evidence of any kind indicating there was a retention/graduation or disparity problem in the mid-1980s for these students in *any* Wisconsin institutions of higher education, much less private and technical colleges. Indeed, if the documents HEAB relies upon are considered at all, they would suggest these Laotian-, Vietnamese-, or Cambodian-American students had the best retention and graduation rates, as the documents indicate Asians had the

best rates of any race, including whites. While HEAB states in conclusory fashion in its response brief that students from these particular Asian groups "faced similar financial and retention problems as [Black American, Hispanic and American Indian students] already eligible for the grant," the record evidence HEAB directs us to in support of this statement does not provide any.

¶54    HEAB relies on the 1987 LFB memo and a Wisconsin Policy Research Institute report written in 1991—the latter published several years *after* the legislature expanded the program to include financially needy descendants of Laotian, Cambodian and Vietnamese citizens. HEAB asserts that the legislature expanded the program in 1987 to include students who were citizens or descended from citizens of only these three particular countries "in response to real-world need: the mass immigration of those students, particularly the Hmong in Wisconsin, after the fall of Saigon in the Vietnam War in 1975, and the corresponding *retention* and financial *needs* of that subset of students." (Emphases added.) Again, HEAB directs us to no record evidence supporting its representation of retention problems at Wisconsin private and/or technical colleges for this "subset of students," and we have found no such evidence. Instead, HEAB directs us to fifteen specific pages in the record, none of which provide any support. Fourteen of the pages say nothing related to any reason why the legislature may have expanded the program to include students of Laotian, Vietnamese or Cambodian descent. And, the one page from the LFB memo that does address the issue says only "Southeast Asian refugees have been identified as a disadvantaged group," noting that "[f]or purposes of federal student financial aid, Southeast Asian refugees from Laos, Vietnam and Cambodia who were admitted to the U.S. after 1975 are eligible for aid." This of course says nothing as to any percentage of students from these groups who were actually in need of or

received financial aid, and it certainly says nothing about retention/graduation rates for students from these groups. But even more significantly, the memo indicates that relevant "[d]ata is not available from private colleges" and "[n]o data is available to indicate the number of Southeast Asians enrolled at public or private institutions."[17] It would seem to go without saying that without such data, there would be no way for the legislature or anyone else to determine if there was a retention/graduation or disparity problem for students in this particular group. Nothing in the record supports a conclusion that the legislature expanded the grant program to include students descended from citizens of Laos, Vietnam or Cambodia[18] because of a retention/graduation or disparity "crisis" at private or technical colleges.

¶55  Additionally, the second part of the expansion of the grant program allowed for grants for students enrolled at technical colleges, not just private colleges. As indicated, *supra* ¶¶50-52, HEAB has directed us to no evidence suggesting a retention/graduation or disparity problem existed for any particular racial, national origin, ancestry or alienage group at technical colleges at the time of the grant program's expansion in 1987, much less to evidence suggesting any

---

[17] Most of the pages cited by HEAB say nothing specific to Laotian, Vietnamese, or Cambodian persons. Other pages cited refer to studies of these groups of persons across the United States generally but not Wisconsin specifically. Furthermore, the reports are from 2012, 2020 and 2022, and thus quite obviously could not have been considered by the legislature when it included descendants of citizens of these three countries in the grant program in 1987.

[18] Of note, the 1991 report HEAB relies upon indicates not only that there was an influx of Hmong immigrants from Laos, Vietnam and Cambodia in the years leading into expansion of the grant program but that there was an influx from neighboring Thailand as well. The report states that "[f]rom a base of about 2,000 to 2,500 persons in 1978, population in [named Wisconsin] communities expanded by another 5,000 during the large influx from Thailand during the years 1979 to 1981." The 1987 expansion of the grant program, however, did not include Thai citizens or descendants.

such problem was due to financial struggles of students. Indeed, in light of the complete absence of evidence indicating a disparity in retention and/or graduation rates between students in the preferred racial, national origin, ancestry and alienage groups and those in the nonpreferred groups, it could just as well be that the legislature simply expanded the program in 1987 to also include technical colleges because of a successful "us too" lobbying effort on legislators by persons with technical college interests. Perhaps the private and technical colleges raised concern that they would lose students from the preferred groups to the UW system four-year universities if the private and technical colleges did not also have grants available for these students to attend the private and technical colleges. HEAB certainly has not met its burden to show that the legislature enacted WIS. STAT. § 39.44 as to private colleges in 1985 and expanded it to technical colleges in 1987 because of a retention/graduation or disparity problem for students of the preferred racial, national origin, ancestry and alienage groups at these institutions.

¶56 To show that the legislature enacted this race-, national origin-, ancestry-, and alienage-based financial aid program because of a compelling government interest, HEAB is required to "demonstrate with clarity that its 'purpose or interest is both constitutionally permissible and substantial.'" *See Fisher*, 570 U.S. at 309 (citation omitted). As appellants point out in post-oral argument briefing, HEAB "is not even close to establishing a compelling interest." It has not shown that increasing retention/graduation rates for students of the preferred minority groups and/or mitigating a disparity between students of the preferred and nonpreferred groups constitutes a compelling state interest, has not shown there even was a retention/graduation or disparity "crisis" at Wisconsin private and technical colleges leading into the establishment of this program, and has not shown that the legislature enacted this grant program based upon a belief

34

there was such a crisis or disparity or for the purpose of mitigating any disparity at private and technical colleges. As a result, we need not decide whether the program is narrowly tailored to accomplish the purported goal. Nevertheless, we will discuss several points raised in connection with the narrowly tailored strict scrutiny requirement.

### 2. Narrowly Tailored Requirement

¶57 The government "receives no deference" with regard to "prov[ing] that the means chosen" to attain a compelling interest "are narrowly tailored to that goal." *Id.* at 311. The government must demonstrate that the means used "ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Id.* at 312 (citation omitted). Race as a determinative criterion is flatly impermissible under the Equal Protection Clause. *See Gratz*, 539 U.S. at 274-75 (determining a university's admissions program violated the Equal Protection Clause because it utilized race as "a decisive factor for virtually every minimally qualified underrepresented minority applicant").

¶58 HEAB maintains that analysis of whether the grant program is narrowly tailored "must be guided by the nature of financial aid and the [g]rant [p]rogram at issue here." "Unlike admissions," HEAB continues, "the [g]rant [p]rogram closes the classroom doors to no one. It is instead part of a bigger picture of retaining diverse students already lawfully admitted, and it is but a tiny part of a financial picture." Post-*SFFA*, HEAB insists that the grant versus admissions distinction is "key" because *SFFA* "focuses on the 'zero-sum' nature of admissions." "[F]inancial aid … is nothing like restrictive admissions," HEAB asserts, "where students fill a set number of limited slots in the class, to the

detriment of all others … [and] every admitted student means one fewer opening in the class." Because of this distinction, HEAB insists **SFFA** "has no bearing on whether the grants at issue here are valid based on the evidence presented in the [circuit] court." HEAB further claims "the unrefuted evidence in the record *proves* that the grant program actually means that more race-neutral financial aid dollars are available for every other admitted student." (Emphasis added.) HEAB's assertions do not withstand scrutiny.

¶59 To begin, while the **SFFA** Court did recognize that the admissions scenario is a "zero-sum" one, that recognition was mentioned only once and only in response to Harvard's contention that it did not use race as a "negative"; it also came *after* the Court had already held that the Harvard and UNC admissions programs failed to satisfy both the compelling interest and narrowly tailored requirements of strict scrutiny. **SFFA**, 600 U.S. at 218. **SFFA** certainly did not "focus" on the "'zero-sum' nature of admissions"; rather, it focused on the pernicious nature of racial classifications. *See, e.g.*, **id.** at 217. In short, the zero-sum nature of admissions was not "key" to the decision.

¶60 That said, as appellants pointed out at oral argument, these grants also present a zero-sum scenario in the relevant context: financial aid. As part of the biennial budget process, the legislature funds a sum certain amount for distribution to participating private and technical colleges. It is axiomatic that if financially needy students from additional minority groups—such as Asians from nonpreferred countries or Middle Easterners—and/or white students were also made eligible for the grant program, there would be less money available for those from the preferred groups who are currently eligible. This point is further made by HEAB's expert who asserts in her affidavit that "[b]ecause the [grants] are already based on need," if race is used only as one of multiple factors for a

financial aid award, as opposed to being a determinative factor, "the effectiveness of the [Minority Undergraduate Retention Grant] program [would be diluted], given the much larger actual numbers of non-minority students with financial need." Indeed, HEAB acknowledged this point at oral argument, stating that expansion of the grant program to include all financially needy students would "dilute the pool of money that's available" for those minority students currently eligible. In short, by excluding other financially needy students, there is more money to allocate to students from the preferred groups.

¶61 HEAB also asserts the grant program is constitutional in part because the grant funds represent only a very small amount of the total aid dollars available for Wisconsin college students. So, essentially, HEAB asserts the grant program is constitutional because it constitutes only a little bit of race, national origin, ancestry, or alienage discrimination. HEAB provides no legal support for such a position. *SFFA* teaches that courts should consider how they would view a challenged program if it allowed for the same form of discrimination *against* applicants from the preferred minority groups instead of in favor of such applicants:

> [w]hile the dissent would certainly not permit university [admissions] programs that discriminated *against* black and Latino applicants, it is perfectly willing to let the programs here [discriminating *in favor* of black and Latino applicants and against white and Asian applicants] continue. In its view, this Court is supposed to tell state actors when they have picked the right races to benefit. Separate but equal is "*inherently* unequal," said *Brown*. It depends, says the dissent.

*SFFA*, 600 U.S. at 229 (citation omitted). If only white and Asian students were eligible for the WIS. STAT. § 39.44 grant program—obviously then automatically excluding Black American, Hispanic, and American Indian students—such a

37

program would not withstand constitutional scrutiny for two seconds, and properly so. *SFFA* instructs that the same considerations should apply as they would if the tables were turned.

¶62 As to HEAB's claim that the evidence of record "*proves* that the grant program actually means that more race-neutral financial aid dollars are available for every other admitted student," it is a farce. (Emphasis added.) To begin, this is akin to saying it is constitutionally tolerable to exclude students of certain racial, national origin, ancestry or alienage groups from admission to University A because Universities B and C do not exclude those students, and if students of preferred racial, national origin, ancestry or alienage groups are admitted to University A, then Universities B and C will have more open admission slots—and hence students excluded from University A will have a better opportunity for admission at Universities B and C. As appellants write,

> [n]o doubt [WIS. STAT. §] 39.44 would be struck down immediately, and rightly so, if the [grant program] funds were only available to [financially needy] white students.
>
> Section 39.44 is no different. It imposes a racial restriction on who may receive taxpayer funds to finish out a college degree…. It provides cold comfort to a financially needy Afghan-American or Thai-American applicant that only *some* doors are closed to them based on their race while others are open to everyone.

We further agree with appellants' statement that "[t]he inquiry is not whether there are other opportunities available without a racial restriction besides the $819,000 pool of [grant program] funds. The inquiry is whether *this program* meets the stringent criteria for strict scrutiny." And it does not.

¶63 Moreover, the record evidence HEAB directs us to certainly does not *prove* more financial aid dollars are available from other pots of aid for needy

students who are not eligible for the WIS. STAT. § 39.44 grants due to their race, national origin, ancestry or alienage.[19] The "evidence" HEAB directs us to is its expert's unsupported opinion that if these race-based grants are awarded to some students, those same students would not be competing for dollars from other financial aid pots and thus more money would be available from those other pots for "White students." The expert acknowledges her views are based on a study of a *different* grant program—one providing aid based on the same race, national origin, ancestry and alienage groups for students in the UW system—but more importantly, even if the expert's statements did relate to private and technical colleges in Wisconsin, HEAB's evidence does not "prove" what HEAB wishes it did.

¶64 First, there is no indication the provision of aid for students attending private and technical colleges would operate the same as it does for students attending UW system four-year universities.[20] Second, and importantly, the most HEAB's expert says in her affidavit toward the point HEAB tries to make is that the UW system grant program

> *potentially* opened up more funding for White students because other financial aid funds that otherwise *might* have been awarded to minority students are no longer needed by those who were MURG-eligible. Thus, *if* "funds from other need-based grants[] are redirected to Whites as an artifact of the availability of [the] Lawton grant," *then* there is more funding available for White students than is

---

[19] In its pre-*SFFA* response brief, HEAB stated with less certainty that "the evidence shows that the grant may *open up* other funds for non-eligible students, making more aid dollars available to them that otherwise might go to [g]rant [p]rogram recipients." (Underline added.)

[20] Although it may be true, we see no evidence showing that this is an apples to apples comparison such that the expert's opinion based on evidence relating to the UW system four-year schools necessarily carries over to the WIS. STAT. § 39.44 grant program.

> available without the MURG grants, as minority students would also compete for those funds. This re-allocation of funding would reduce and make more diffuse any burden on White students.

(First alteration in original; emphases added; citation omitted.)[21] The best evidence HEAB has provided is sheer speculation that more financial aid money is available from other pots for students prohibited from receiving aid under the grant program because students eligible for the grant program receive aid thereunder. In short, the evidence does not show that the students who receive aid under the grant program are not *also* receiving the same amount of aid from these other financial aid sources as they would receive if the grant program did not exist.

¶65 Additionally, HEAB's entire theory that more financial aid from other pots "might" be available for those precluded from receiving aid from the grant program defies common sense and elementary math. HEAB's theory apparently is that if a student is awarded $1,000 in financial aid through the grant program, he or she will then not receive $1,000 in aid from a different source, thereby leaving that $1,000 available for those students not eligible for aid under the grant program. But if that were true, the grant program would be doing precisely nothing to help the very minority students it purportedly was designed to help. Students receiving the WIS. STAT. § 39.44 grants would still only receive a total of $1,000 in aid for that school year. Only if the grant program provides grant recipients with financial aid *in addition to* aid they receive from other

---

[21] HEAB also directs us to a 1994 document issued by the United States Department of Education that, on the page HEAB directs us to, at most states "a college's receipt of *privately donated monies* restricted to an underrepresented group *might* increase the *total pool* of funds for student aid in a situation in which, absent the ability to impose such a limitation, the donor might not provide any aid at all." (Emphases added.) This document provides no support for HEAB's position related to the WIS. STAT. § 39.44 grant program.

sources (i.e., if the grant program provides recipients *extra* aid) would it appear to serve its purported purpose of relieving financial stress for § 39.44 grant recipients attending private or technical colleges in order to assist in retaining those students through graduation.[22]

¶66    HEAB has directed us to no record evidence showing that students who receive WIS. STAT. § 39.44 grants receive less financial aid from other pots much less that that other financial aid is then received by students who are not eligible for the grant program.  In the end, when confronted with all of this at oral argument and given a post-argument opportunity to brief its assertion that the record evidence "proves that the grant program actually means that more race-neutral financial aid dollars are available for every other admitted student," HEAB was unable to provide evidence supporting the statement.  HEAB's theory in this regard is unsupported and common-sense-defying speculation.

¶67    HEAB also contends in its post-*SFFA* submission that the grant program is narrowly tailored because

> the evidence shows that it is "individualized and flexible,"
> based on considerations such as "background" and
> individual "financial need."    This    data-driven,
> individualized grant is nothing like the admissions policy in
> [*SFFA*].  In fact, its individualized application is consistent
> with the [*SFFA*] Court's blessing that schools consider a
> student's race on an individual basis.

---

[22] As appellants noted at oral argument, WIS. STAT. § 39.44(3) requires that "[a]n institution or school receiving [grant program] funds … shall … (b) Demonstrate to the satisfaction of [HEAB] that such funds do not replace institutional grants to the recipients."  This statutory provision appears to be a recognition by the legislature that students receiving a § 39.44 grant will not actually be aided by it if the grant money they receive merely replaces money they would have otherwise received from other financial aid sources.

(Citation omitted.) Relatedly, HEAB insists that in awarding grants, the grant program considers the "whole person."[23]

¶68 HEAB overlooks a significant point: The grant program completely excludes students *solely* on the basis of race, national origin, ancestry or alienage—something even the unconstitutional Harvard and UNC admissions programs did not do. Under those programs, a student could overcome the fact that he or she is Asian or white with an extraordinary academic record, extracurricular background, or life experience. Here, however, a student's race, national origin, ancestry, or alienage is *the determinative factor* as to grant eligibility. No matter how financially needy a white, Middle Eastern or non-Laotian, non-Cambodian and non-Vietnamese Asian student is, he or she cannot receive any financial aid under this program. The **SFFA** Court noted that "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." 600 U.S. at 218-19. That aptly explains the grant program—the legislature chose winners and losers for these grants based on whether a given student is a member of one of the preferred minority groups. Here, a student of a nonpreferred group is flatly ineligible—race, national origin, ancestry and alienage are "determinative"—for any grant under this program. *See **id.*** at 219.

---

[23] HEAB claims that in awarding grants to students, "schools"—plural—"do not rely 'on a mechanical process.' Rather, 'it is a highly individualized and flexible process that is based upon each student's individual situation.'" (Citation omitted.) Though HEAB appears to represent this as the situation for all Wisconsin private and technical colleges with students who benefit from the grant program, it only directs us to an affidavit from one financial aid counselor at one private college. This hardly suffices as representative of all the private and technical colleges with students who benefit from this program.

¶69　As appellants note, WIS. STAT. § 39.44 "removes from consideration any applicant whose background is European, Thai, or Chinese, among dozens of others, in order to ensure that only those in the racial categories listed in the statute are considered."　A financially needy student who is not a member of one of the preferred groups can do nothing to overcome the race, national origin, ancestry and alienage discrimination intentionally built into the grant program.　An individual is flat-out barred from receiving financial assistance from this program because he or she is not a member of one of the preferred groups.　A young Vietnamese man who aided American troops in the Vietnam War and subsequently immigrated to the United States and became a citizen would be eligible for a grant under this program, as would be all his future descendants.　But a young Afghani woman who aided American troops in Afghanistan, barely escaped with her life during America's withdrawal in 2021, and became an American citizen residing in Wisconsin—even if she has great financial need, excellent academic promise, and a compellingly diverse viewpoint to bring to a college campus—simply will not be eligible for a grant because she is not a Black American, Hispanic, American Indian, or a descendant of a Laotian, Vietnamese or Cambodian citizen.

¶70　Under this grant program, an applicant's race, national origin, ancestry or alienage is *the* defining feature—being a penniless genius will not help an Indian-American student or a student from one of the other nonpreferred racial, national origin, ancestry or alienage groups.　"Individualized" consideration of the "whole person," if it occurs under the grant program, occurs *only* for those students of the preferred races, national origins, ancestries and alienage.　All others receive *no consideration*—they need not apply; the legislature has deemed it so.

¶71 When questioned at oral argument as to why Middle Eastern students were not included in the preferred groups under WIS. STAT. § 39.44, HEAB stated that "there was nothing in the record at the time that Middle Eastern students … were enrolled and failing to retain and graduate." We note that the documents HEAB directs us to indicate nothing about retention and graduation rates in the early to mid-1980s for Wisconsin citizens of Middle Eastern descent. Of course, as noted, HEAB has also failed to direct us to any record evidence indicating there was a retention and graduation problem at any Wisconsin colleges for students who descended from Laotian, Cambodian or Vietnamese citizens, yet these students were included in the preferred groups eligible for these grants.

¶72 In *SFFA*, the Supreme Court was clearly troubled that when it asked at oral argument "how are applicants from Middle Eastern countries classified, [such as] Jordan, Iraq, Iran, [and] Egypt," counsel for UNC responded, "[I] do not know the answer to that question." *SFFA*, 600 U.S. at 216 (alterations in original; citation omitted). Similarly here, counsel for HEAB acknowledged at oral argument that he did not know where a student of Middle Eastern descent would "fit in."[24] As appellants noted during oral argument and we have noted herein, it is

---

[24] Prior to *SFFA*, the U.S. Office of Management and Budget categorized and defined a "White" person as "[a] person having origins in any of the original peoples of Europe, the Middle East, or North Africa." *See* Office of Management and Budget, Statistical Policy Directive No. 15: Standards for Maintaining, Collecting, and Presenting Federal Data on Race and Ethnicity (1997) at https://spd15revision.gov/content/spd15revision/en/history/1997-standards.html. Following *SFFA*, the OMB changed racial/ethnic categorizations as follows: "Middle Eastern or North African[s]" are defined as "[i]ndividuals with origins in any of the original peoples of the Middle East or North Africa, including, for example, Lebanese, Iranian, Egyptian, Syrian, Iraqi, and Israeli" and "White[s]" are defined as "[i]ndividuals with origins in any of the original peoples of Europe, including, for example, English, German, Irish, Italian, Polish, and Scottish." *See* Office of Management and Budget, Statistical Policy Directive No. 15: Standards for Maintaining, Collecting, and Presenting Federal Data on Race and Ethnicity (2024) at https://spd15revision.gov/content/spd15revision/en/2024-spd15/categories-definitions.html.

HEAB that bears the burden to show that the grant program satisfies strict scrutiny.

¶73    Here, the legislature appears to have excluded students of Middle Eastern descent without collecting data as to retention and graduation rates of these students compared to others.  In addition to the many other constitutional problems with this grant program, the government cannot satisfy strict scrutiny by choosing to stick its head in the sand by not gathering relevant data as to whether another racial, national origin, ancestry or alienage group may have a retention/graduation or disparity problem and then excluding students from those groups because there is no relevant data.  The legislature excluded students of Middle Eastern descent from eligibility without any idea as to whether there was a retention/graduation or disparity "crisis" for them, yet, as indicated, it included students of Laotian, Cambodian or Vietnamese citizen descent without any supportive data.  This it cannot do.

### C.  Race cannot be used as a negative.

¶74    The *SFFA* Court stressed that one of the "commands" of the Equal Protection Clause is "that race may never be used as a 'negative.'"  *Id.* at 218.  The Court made clear that "an individual's race may never be used against him in the admissions process," noting that Harvard's consideration of race had resulted in "fewer Asian American and white students being admitted."  *Id.* (citation omitted).  The Court explained, "How else but 'negative' can race be described if, in its absence, members of some racial groups would be admitted in greater numbers than they otherwise would have been?"  *Id.* at 219.

¶75    HEAB's position, which it bases on its expert's affidavit, is that if students of nonpreferred races, national origins, ancestries or alienage were also

made eligible for these grants, it would "dilute the pool of money that's available" for the preferred groups currently eligible for grants under WIS. STAT. § 39.44. This seems to us a recognition that race, national origin, ancestry and alienage are "used as a negative," because without those racial, national origin, ancestry and alienage restrictions built into the program, minority students of the nonpreferred groups and nonminority students in need of financial aid would receive more than the zero dollars they are currently eligible for. "[R]ace—and race alone" explains who is eligible to receive these taxpayer dollars; "race is determinative for [all] of the students" precluded from eligibility for these grants. *See SFFA*, 600 U.S. at 219 & n.6.

¶76 Indeed, "[h]ow else but 'negative'" can race, national origin, ancestry and alienage be described if students of certain groups are flatly ineligible for grants under WIS. STAT. § 39.44 simply because they are of the "wrong" race, national origin, ancestry and/or alienage. The *SFFA* Court expressed its concern that "race—and race alone—explains the admissions decisions for hundreds if not thousands of applicants to UNC each year." 600 U.S. at 219 n.6. Where, as here, race, national origin, ancestry or alienage play a determinative role in eligibility for these taxpayer-funded grants, the constitutional promise of equal protection is abandoned and the grant program is "infirm." *See id.* at 219.

## D. There must be an end point; WIS. STAT. § 39.44 has none.

¶77 Even if the grant program survived strict scrutiny and if race, national origin, ancestry and alienage were not being used in a negative manner, the program would still violate the Equal Protection Clause because "all governmental use of race must have a logical end point," *Grutter*, 539 U.S. at 342, and WIS. STAT. § 39.44 and the grant program have none. The *SFFA* Court emphasized the *Grutter* Court's holding that "[a]t some point" race-based admissions programs "must end." *SFFA*, 600 U.S. at 212. The *SFFA* Court noted that "[t]his requirement was critical, and *Grutter* emphasized it repeatedly." *SFFA*, 600 U.S. at 212. The belief that there was an "end point … was the reason the [*Grutter*] Court was willing to dispense temporarily with the Constitution's unambiguous guarantee of equal protection." *SFFA*, 600 U.S. at 212. The *SFFA* Court noted that the *Grutter* Court "insist[ed], over and over again, that race-based admissions programs be limited in time," *SFFA*, 600 U.S. at 229 n.9, and recognized that "[e]nshrining a permanent justification for racial preferences would offend this fundamental equal protection principle," *id.* at 212-13 (quoting *Grutter*, 539 U.S. at 342-43). The Court hammered home the point that even if a race-based program might otherwise pass constitutional muster, it will not survive if it has no clear end point—a point at which preferences, benefits, and detriments based on race end and individuals truly are treated as individuals and not as members of a particular racial, national origin, ancestry or alienage group. *See id.* at 212-13, 221-25.

¶78 Harvard's race-based and discriminatory admissions program had no "sunset date," and UNC's program was

> likewise not set to expire any time soon—nor, indeed, any time at all. The University admits that it "has not set forth

47

> a proposed time period in which it believes it can end all race-conscious admissions practices." … In short, there is no reason to believe that respondents will—even acting in good faith—comply with the Equal Protection Clause any time soon.

*Id.* at 225 (citation omitted). "'Classifying and assigning' students based on their race," the *SFFA* Court stated, "requires more than … an amorphous end to justify it." *Id.* at 214 (quoting *Parents Involved*, 551 U.S. at 735).

¶79 Through oral argument and briefing, HEAB essentially has taken the extraordinary position that even though the intentional racial, national origin, ancestry and alienage discrimination of WIS. STAT. § 39.44 has no end point, it is nonetheless saved by the simple fact that, pursuant to § 39.44(5) and the biennial budget process, the legislature receives "updates" on the status of the program[25] and has the power to change or eliminate § 39.44 and the grant program if it chooses. Of course, that is not how constitutional jurisprudence works. Section 39.44, with its by-design racial, national origin, ancestry and alienage discrimination, is still on the books—and has been for forty years—and taxpayer dollars continue to be spent on the program. The legislature (with or without the governor) could change it, but has not. Not surprisingly, HEAB has directed us to no legal support for its novel position that an unconstitutional law may remain intact simply because lawmakers are informed of how the law is working and

---

[25] HEAB goes to much effort to show the effectiveness of the grants by pointing to statistics indicating that students of the preferred groups who receive these grants stay in school and graduate at a higher rate than students of the preferred groups that do not receive grants. This, of course, is not surprising—if a student can spend more time during the school year studying for tests and writing papers, getting better rest, recreating, etc. instead of working extra hours at a job to fund his or her education, he or she is likely to perform better at and stay in school. This reality, of course, also helps explain why indigent students from nonpreferred groups are put at a competitive, and unconstitutional, disadvantage from equally indigent students who receive the grants.

could one day repeal it or amend it to make it constitutional, even though they have not chosen to do so.

¶80 And, most significantly, the *SFFA* Court unmistakably shot down a similar assertion in that case, stating that "*Grutter* never suggested that periodic review could make unconstitutional conduct constitutional. To the contrary, the Court made clear that race-based admissions programs eventually had to end—despite whatever periodic review universities conducted." *SFFA*, 600 U.S. at 225. Likewise here, informative updates to the legislature cannot save this unconstitutional grant program; there *must* be an end, and the statute provides for none. So, with this decision, we provide that end.

¶81 The grant program has been in effect for nearly forty years now, and there is no end in sight. No sunset provision is included in WIS. STAT. § 39.44. There are not even disparity standards that would trigger the end of the program. Thus, even if ten years from now Black American, Hispanic, American Indian, Laotian, Cambodian, and Vietnamese-American students at Wisconsin private and technical colleges are all consistently being retained and graduating at a *higher* rate than white, Middle Eastern, and nonpreferred Asian students, members of the preferred minority groups will continue to be the only students eligible to receive these grants. Consistent with *SFFA*, § 39.44 and this grant program fall for the additional reason that the program has no end point.

## CONCLUSION

¶82 In 1868, the states ratified the Fourteenth Amendment, providing our nation the promise, the ideal, and the hope of equal protection. To accomplish that, the amendment provides, in part: "No State shall … deny to *any person* within its jurisdiction the equal protection of the laws." U.S. CONST. amend XIV

49

(emphasis added). In the decades that followed, the promise, ideal and hope of equality went unrealized as Jim Crow laws and segregation took hold.

¶83    The United States Supreme Court's decision in ***Brown***, 347 U.S. 483, and years of federal court decisions following ***Brown***, again provided hope that the promise and ideal of equal protection might be realized. Unfortunately, rather than "right the ship" of the Equal Protection Clause, the ***Brown*** decision was followed by decades of the government pendulum overswinging in the other direction, leading to the institutionalization of policies that in many ways favored persons of previously disfavored races and ethnicities to the detriment of persons of other races and ethnicities.

¶84    With its decision in ***SFFA***, the Supreme Court attempted to refocus the Equal Protection Clause to the promise, ideal and hope of equality. Two principles stand out as most impactful from that decision. First, as relevant to the case now before us, the ***SFFA*** Court invites consideration of how this grant program would fare legally if it were providing these grants only for financially needy white and non-preferred Asian students; thereby necessarily excluding equally financially needy Black American, Hispanic, Native American, Laotian, Cambodian, or Vietnamese students from receiving these grants. As indicated earlier, such a program would not survive equal protection scrutiny for two seconds. And neither should—neither does—WIS. STAT. § 39.44 and the grant program. As the ***SFFA*** majority chastised the dissent in that case, courts are "[not] supposed to tell state actors when they have picked the right races to benefit. Separate but equal is '*inherently* unequal,' said ***Brown***." ***SFFA***, 600 U.S. at 229. Second, the ***SFFA*** Court was abundantly clear in expressing that a person "must be treated based on his or her experiences as an individual—not on the basis of race." ***Id.*** at 231.

50

¶85    At oral argument, HEAB asserted that the grant program is about "equaliz[ing] opportunity" for the students who are eligible for the grants. But utilizing race, national origin, ancestry and alienage as the discriminating factor to try to accomplish this is directly at odds with what our Supreme Court recently made abundantly clear—that "no State has *any authority* under the equal-protection clause of the Fourteenth Amendment to use race as *a* factor in affording educational *opportunities* among its citizens." *Id.* at 204 (emphases added; citation omitted). With the grant program, race, as well as national origin, ancestry and alienage, is not just "a" factor for determining whether a financially needy student will be eligible for a grant under this program, it is the determinative factor.

¶86    While HEAB attempts to limit the holding of *SFFA* to only race-based college admissions programs, the *SFFA* Court did not so limit the application of the equal protection principles it articulated. Indeed, those principles appear to apply to nearly every context in which government attempts to use race, national origin, ancestry or alienage as a discriminating factor, just as the principles articulated in *Brown* were applied by lower courts and the Supreme Court to "invalidate[] all manner of race-based state action" in the years following that decision. *See SFFA*, 600 U.S. at 204. In short, except in the extremely limited and "most extraordinary" circumstances identified in *SFFA*, *see supra* ¶44, government funding or support designed to provide a benefit or cause a detriment to persons based even in part on their race, national origin, or ancestry cannot stand. Moreover, even in those limited and extraordinary circumstances, the government funding or support cannot stand without a clear end point.

¶87    Because the grant program violates the Equal Protection Clause, we reverse the order of the circuit court and remand for the court to enter an order

enjoining HEAB and Hutchinson from further administering the grant program or distributing funds thereunder. *See* ***Thompson v. Kenosha County***, 64 Wis. 2d 673, 680, 221 N.W.2d 845 (1974) (stating that where a state law requires the expenditure of public funds, if the law is determined to be unconstitutional, "this expenditure would also be illegal"). WISCONSIN STAT. § 39.44 and the related grant program are unconstitutional on their face. In so holding, we adhere to the refocusing of the Equal Protection Clause by the *SFFA* Court for the realization of the promise, ideal and hope of equal protection.

> *By the Court.*—Order reversed and cause remanded with directions.

> Recommended for publication in the official reports.